UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JOSE ALBERTO VAZQUEZ RIVERA,                    :
                                                :
                    Plaintiff,                  :
                                                :        **OPINION**
        -against-                               :        21-CV-1498 (KHP)
                                                :
COMMISSIONER OF SOCIAL SECURITY,                :
                                                :
                    Defendant.                  :
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _8/9/2022_

**KATHARINE H. PARKER, United States Magistrate Judge**.

        Plaintiff Jose Alberto Vazquez Rivera, represented by counsel, commenced this action

against Defendant, Commissioner of the Social Security Administration ("SSA"), pursuant to the

Social Security Act (the "Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of Defendant's decision

that he was not disabled as of September 1, 2016, the onset date of his alleged disability,

through the date of the decision, July 9, 2020, and accordingly was not eligible for Social

Security Disability Benefits ("SSD") and Supplemental Security Income ("SSI") during that

period.  Plaintiff and Defendant both moved for judgment on the pleadings.  (ECF No. 29 ("Joint

Stipulation").)

        For the reasons set forth below, the Court GRANTS Plaintiff's motion and DENIES

Defendant's motion, and remands the case for further proceedings.

**BACKGROUND**

        Plaintiff, born in 1975, has a high school education through the eleventh grade.  (A.R.

50-51.)  He is from Puerto Rico and speaks Spanish.  (A.R. 34.)  He understands some English

but does not speak it.  (*Id.*)  He is unmarried and has one child who lives with the child's mother

in Puerto Rico.  (A.R. 50.)  From approximately 2002 until 2016, Plaintiff performed

maintenance work.  (A.R. 86.)  In approximately 2014 and 2015, Plaintiff was the victim of several violent crimes, and in 2016, Plaintiff witnessed the shooting of his neighbor.  (A.R. 435.)  Also in 2016, Plaintiff's father passed away.  (A.R. 590, 603.)  Possibly as a result of these episodes, Plaintiff became very depressed and struggled with anxiety, insomnia, auditory hallucinations, and other symptoms of mental illness.  (*Id*.)  In 2016 and 2017, Plaintiff's treating physicians in Puerto Rico diagnosed him with chronic post-traumatic stress disorder ("PTSD"), panic disorder, severe and recurrent major depressive disorder with psychotic symptoms, cannabis dependence, and generalized anxiety disorder.  (A.R. 436-37, 516-17.)

In the summer of 2018, Plaintiff moved from Puerto Rico to New York.  (A.R. 589.)  Plaintiff initially resided with his aunt and uncle in the Bronx, and subsequently became homeless.  (A.R. 35, 50.)  On June 1, 2018, Plaintiff applied for SSD and SSI.  (A.R. 88-89; 321-27.)  Between August 9, 2018, and approximately January 2020, Plaintiff was treated by psychiatrist Dr. Luis Gonzales in the Bronx.

**1. Relevant medical evidence**

a. <u>Treatment in Puerto Rico, September 2016 – May 2018</u>[1]

On September 7, 2016, Plaintiff visited Med Centro Healthcare System due to inability to sleep.  (A.R. 437.)  He was seen by Dr. Felix Arroyo.  (*Id.*)  Plaintiff informed Dr. Arroyo that he had recently been the victim of two traumatic events and that he was re-experiencing the past trauma; and that he was experiencing fatigue, decreased concentration, depression, persistent worry, decreased appetite, and disturbed sleep.  (*Id.*)  Plaintiff also reported that he

---

[1]  Significant portions of these medical records have not been translated out of the original Spanish.  The summary of relevant medical evidence relies on Google Translate to translate portions of the record.  There is no evidence that the Commissioner or ALJ translated or reviewed the Spanish-language portions of the record.

was misplacing items and forgetting names. (*Id.*) An examination revealed that Plaintiff was suffering from depersonalization and paranoid delusions, but that his "rate of thought was normal," and his "insight was intact." (A.R. 438.) Dr. Arroyo diagnosed Plaintiff with panic disorder without agoraphobia, and cannabis dependence. (*Id.*)

On approximately September 23, 2016, Plaintiff underwent a crisis hospitalization at Pavia Yauco Hospital as a result of experiencing auditory hallucinations and disorganized thoughts. (*See* A.R. 426, 468, 484, 589, 596, 601.) Plaintiff later informed a treating psychiatrist that during this hospitalization, he tried to escape the hospital through a closed iron gate. (A.R. 426.) This hospitalization is noted in numerous medical reports, but no records from Pavia Yauco are included in the administrative record.

On September 28, 2016, Plaintiff returned to Med Centro for psychiatric therapy with psychologist Dr. Monica Cruz, Ph.D. (A.R. 435.) Plaintiff reported that he was experiencing decreased appetite and insomnia. (*Id.*) Dr. Cruz noted that Plaintiff desired to continue living, had no hallucinations, did not frequently become lost, did not engage in repeated questioning about recent events, and had no memory lapses. (*Id.*) Dr. Cruz found that Plaintiff had anxiety and depression with paranoid delusions, but that he demonstrated no violent behavior. (*Id.*) Upon examination, Dr. Cruz found that Plaintiff had normal general appearance and level of consciousness, but had a frustrated, unhappy, depressed, fearful, anxious and concerned mood with anhedonia (i.e. the inability to feel pleasure), and sad affect with excessive worry. (*Id.*) Dr. Cruz diagnosed Plaintiff with chronic PTSD and panic disorder without agoraphobia. (A.R. 436.)

On December 29, 2016, Plaintiff was seen at Ponce Health Sciences Wellness Center ("Ponce"). (A.R. 514.) Mental status findings included an anxious and depressed mood, visual

and auditory hallucinations, increased motor activity,[2] paranoia, and occasional loss of impulse control. (A.R. 516-17.) Plaintiff's eye contact, appearance, behavior, affect, speech, and thought process were normal. (*Id*.) Plaintiff was diagnosed with severe recurrent major depressive disorder with psychotic symptoms, cannabis abuse, and generalized anxiety disorder. (*Id.*)

Plaintiff returned to Ponce numerous times in 2016 and 2017 to collect his prescribed medications, and he was examined each time. Notes from several of these appointments describe Plaintiff as stable and asymptomatic. (*See, e.g.,* A.R. 486, 453, 554.) At a follow-up visit on January 27, 2017, Plaintiff reported that he was experiencing anxiety, insomnia, irritability, and low self-esteem. On May 10, 2017, Plaintiff reported episodes of anxiety, but was described as stable. (A.R. 532-35.) The medical report from this appointment states that Plaintiff missed some prior appointments due to anxiety episodes. (A.R. 535.)

On June 22, 2017, Plaintiff returned to Med Centro for psychiatric therapy, and he was seen by Dr. Felix Maldonado Santos. (A.R. 426.) Dr. Santos noted that Plaintiff had been referred by his primary physician for presenting depressive symptoms. (*Id.*) Plaintiff reported that he experienced delusions of being persecuted as well as frequent nightmares and flashbacks to a time that he was robbed at gunpoint, and that he cannot socialize because he is afraid of being mugged again. (*Id*.) Dr. Santos diagnosed Plaintiff with PTSD and prescribed Fluoxetine, Clonazepam, Restoril, and Risperdal. (*Id*.) These medications are typically

---

[2] Increased motor activity is "a cardinal feature of mania." A. Minassian et al, *The quantitative assessment of motor activity in mania and schizophrenia*, J. Affect Disord. 2010, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2795051/#:~:text=Increased%20motor%20activity%20is%20a%20cardinal%20feature%20of%20mania%2C%20characterized,psychomotor%20agitation%E2%80%9D(1994).

prescribed for depression, panic attacks, insomnia, and symptoms of mania or bipolar disorder, respectively.  (Joint Stipulation at 5.)

Plaintiff saw Dr. Santos again on February 15, 2018.  (A.R. 420.)  He reported depression, anxiety, and insomnia, but he reported no suicidal thoughts and demonstrated no inappropriate behavior.  (*Id.*)  A mental status examination found Plaintiff exhibited an unhappy, frustrated, and depressed mood with a congruent affect that was anhedonic.  (*Id.*)  Other results were unremarkable.  (*Id.*)  Dr. Santos assessed Plaintiff as having major depression, panic disorder without agoraphobia, and continuous cannabis dependence.  (*Id.*)

On February 27, 2018, Plaintiff returned to Ponce for a follow-up visit.  (A.R. 549.)  Notes from the visit state that Plaintiff forgot to attend certain prior appointments.  (*Id.*)  Plaintiff returned to Ponce on May 25, 2018, reporting a depressed mood.  (A.R. 563.)  On examination, the doctor reported no abnormal results and described Plaintiff as stable.  (A.R. 567-68).  Plaintiff was diagnosed with recurrent severe major depressive disorder without psychotic features, and cannabis abuse, and he was prescribed Klonopin, Prozac, and Seroquel, the last of which is typically prescribed to treat schizophrenia and bipolar disorder.  (A.R. 569, Joint Stipulation at 5.)

### b.  Dr. Luis Gonzales at Urban Health Plan, Inc., August 2018 – January 2020

On August 8, 2018, Plaintiff began treatment at Urban Health Plan, Inc. in the Bronx, New York.  (A.R. 601.)  He was first seen by the social worker Franklin Velazquez, LCSW.  (*Id.*)  Plaintiff reported that he was experiencing auditory hallucinations, sad mood, anxiety, excessive worry, a phobia regarding going outside because he felt like he was being followed, isolative behavior, decreased energy, decreased concentration, feelings of worthlessness,

difficulty sleeping, increased appetite, passive suicidal thoughts, diminished interests, anger, and problems getting along with others.  (*Id.*)  He also reported experiencing intrusive thoughts of a homicide he had witnessed.  (*Id.*)  Plaintiff informed Mr. Velazquez that he had a long history of depression, but that his depression was aggravated in 2016 when his father died. (A.R. 603.)  Plaintiff also informed Mr. Velazquez that he had undergone a crisis hospitalization in 2016, which he understood was due to auditory hallucinations.  (*Id.*)  A mental status examination revealed a sad mood, blunted affect, auditory hallucinations approximately three times a week, passive suicidal ideation, and very poor memory, with otherwise normal results. (*Id.*)

The following day, on August 9, 2018, Plaintiff was seen by psychiatrist Dr. Luis Gonzales, M.D.  (A.R. 596.)  Plaintiff reported that he had a long psychiatric history that was exacerbated in 2016, when Plaintiff started walking around at night telling people he thought someone was out to kill him.  (*Id.*)  Plaintiff reported poor concentration, poor energy, crying spells, anhedonia, auditory hallucinations, paranoia, poor sleep, anxiety attacks three to four times a week, excessive worry, isolative behavior, a sense of impending danger, shortness of breath, hyperventilating, insomnia, feelings of worthlessness, and decreased interest, among other symptoms.  (A.R. 596-97.)  A mental status examination found Plaintiff to have fair attention, depressed mood, constricted affect, and only fair insight.  (A.R. 599.)  Plaintiff's appearance, orientation, attitude, psychomotor activity, speech, thought process and content, and judgment were normal.  (*Id.*)  Dr. Gonzales diagnosed recurrent, severe major depressive disorder with psychotic features.  (*Id.*)  He prescribed Fluoxetine and Quetiapine.  (A.R. 600.)

Plaintiff continued to see Dr. Gonzales for follow-up appointments approximately once a month until at least January 2020.  Plaintiff's diagnoses remained mostly unchanged throughout this period.  (A.R. 614-58.)  Mental status examinations throughout this period found that Plaintiff exhibited a depressed mood, fair to good hygiene, normal psychomotor activity, and no suicidal and homicidal thoughts.  (*Id.*)

Plaintiff's symptoms fluctuated throughout his treatment.  For example, at a follow-up appointment with Dr. Gonzales on September 6, 2018, Plaintiff reported some improvement, but complained of poor sleep, anxiety, and decreased memory.  (A.R. 638-39.)  At Plaintiff's next appointment on October 3, 2018, Plaintiff stated he was "not doing well," and a mental status examination found a depressed mood with a constricted affect.  (A.R. 636.)  At his appointment on November 2, 2018, Plaintiff described feeling overwhelmed, depressed, and anxious with some insomnia, but he reported some improvement on November 20, 2018.  (A.R. 632, 634.)  At a December 7, 2018 appointment, Dr. Gonzales noted Plaintiff's depressive symptoms had "improved substantially."  (A.R. 630.)  Plaintiff did not attend his appointment in January 2019, and he explained at his February, 2019 appointment that he missed his January appointment because his sister, whom he relied on to drive him to appointments, had become ill.  (A.R. 628.)  Plaintiff reported that he was doing worse because he had run out of medications, but Dr. Gonzales found that Plaintiff's mood was euthymic, and his thought processes were intact.  (A.R. 626.)  At Plaintiff's March, April, and May follow-ups, Dr. Gonzales' found him to have a depressed mood with a constricted affect, with otherwise normal results. (A.R. 620-25.)  At his appointments during the summer of 2019, Plaintiff reported feeling more depressed because he had run out of medications.  (A.R. 614, 618.)  In November 2019, Plaintiff

reported poor memory and poor sleep.  (A.R. 724-29.)  Dr. Gonzales prescribed Ambien for

insomnia, with continued Clonazepam, Fluoxetine, Quetiapine, and Temazepam.  (A.R. 724.)

On December 6, 2019, Plaintiff reported that he stopped his medications due to financial

problems, anxiety, and difficulties interacting with his sister, resulting in increased depression.

(A.R. 722.)  On January 3, 2020, Plaintiff reported that he was "ok" but that he had continued

difficulties sleeping.  (A.R. 719.)

In a document titled "Medical Source Statement About What the Claimant Can Still Do

Despite Mental Impairment(s)" dated January 4, 2020, Dr. Gonzales noted that Plaintiff

suffered from recurrent depression and anxiety.  (A.R. 739.)  He stated that clinical signs and

symptoms included poor memory, appetite, disturbance with weight change, sleep

disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interests,

psychomotor retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating,

social withdrawal or isolation, abnormal affect, decreased energy, and generalized persistent

anxiety.  (*Id.*)  Dr. Gonzales specified that these symptoms and limitations were based on

evidence of sadness, depression, anxiety, anhedonia, poor appetite, feelings of hopelessness

and helplessness, poor attention, and poor concentration.  (A.R. 740.)  Dr. Gonzales opined that

Plaintiff suffered a "marked loss" of functioning in his ability to perform a wide range of work-

related mental activities, including remembering locations and procedures, and maintaining

regular attendance.[3]  (A.R. 740-41.)  Dr. Gonzales estimated Plaintiff would miss work approximately three times a month due to his impairments or treatment.  (A.R. 740.)

At a follow-up with Dr. Gonzales on January 31, 2020, Plaintiff reported having a better response to medication than in the past.  (A.R. 749.)  On March 31, 2020, Plaintiff spoke over the phone with the Physician's Assistant, Jhanine L. Alamo.  (A.R. 747.)  Plaintiff reported that he had not left his home for the past three weeks due to fear of Covid-19.  (*Id.*)  Plaintiff returned for another telephonic appointment on June 2, 2020.  (A.R. 743-46.)  Plaintiff reported feeling depressed but not suicidal.  (A.R. 746.)

     c.   <u>Frances Rodriguez, Psy.D., SSA Consultative Examining Psychologist – August 6, 2018.</u>

On August 6, 2018, Dr. Frances Rodriguez evaluated Plaintiff at the behest of the SSA. (A.R. 589.)  Dr. Rodriguez did not indicate that he reviewed any treatment records.  (*Id.*) Plaintiff stated he could not work due to anxiety, depression, and panic attacks.  (*Id.*)  Plaintiff described symptoms of panic attacks, disturbed sleep, fluctuating appetite with weight change, dysphoric moods, crying spells, loss of interests, irritability, fatigue, loss of energy, feelings of worthlessness, diminished self-esteem, concentration difficulties, and social withdrawal.

---

[3]  Specifically, Dr. Gonzales opined that Plaintiff had a marked loss in his ability to: remember locations and procedures; understand and remember very short, simple instructions; carry out very short, simple instructions; maintain attention and concentration for extended periods; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; deal with stress of semi-skilled and skilled work; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday/workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; adhere to basic standards of neatness or cleanliness; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places; use public transportation; and set realistic goals or make plans independently.  (A.R. 740-41.)  "Marked loss" of functioning is defined as a "substantial loss in the named activity; can sustain performance only up to 1/3 of an 8-hour workday."  (*Id.*)

(A.R. 589-90.)  A mental status examination revealed fair grooming with a slouched appearance, lethargic motor behavior, fair eye contact, monotonous speech, a depressed affect, a dysthymic mood, impaired attention and concentration, impaired memory skills, below average intellectual functioning, decreased fund of information, and fair insight and judgment.  (A.R. 591-92.)  Other findings included coherent and goal-directed thought process with no evidence of hallucinations, delusions or paranoia in the evaluation setting, and clear sensorium.  (A.R. 591.)

Dr. Rodriguez diagnosed severe and recurrent major depressive disorder with psychotic features, and PTSD.  (A.R. 593).  He opined that Plaintiff had "moderate" limitations in his ability to understand, remember, or apply complex directions and instructions; interact adequately with supervisors, co-workers, and the public; sustain concentration and perform a task at a consistent pace; and regulate emotions, control his behavior, and maintain well-being. (A.R. 592-93.)  He also assessed "mild" limitations in Plaintiff's ability to understand, remember, or apply simple directions and instructions; and sustain an ordinary routine and regular attendance at work.  (A.R. 593.)

d. <u>Non-examining Psychologists – Drs. Bhutwala (September 4, 2018) and Khan (January 2020).</u>

On September 4, 2018, psychologist Dr. S. Bhutwala, Ph.D., reviewed Plaintiff's file at the request of the SSA.  (A.R. 73-74, 80-85.)  Dr. Bhutwala did not state what records were included in his review or whether the records he reviewed had been translated from Spanish to English.[4]  Dr. Bhutwala stated that he had insufficient evidence to rate Plaintiff's psychiatric

---

[4]  Evidence suggests Dr. Bhutwala may not have been provided with the full extent of Plaintiff's then-existing medical records.  Specifically, Dr. Bhutwala stated that Plaintiff stopped treatment with Dr. Santos in 2017, (A.R.

allegations prior to September 30, 2017 (the date last insured).  (A.R. 74.)  Regardless, Dr.

Bhutwala opined that Plaintiff had "moderate" limitations in the broad functional areas

regarding understanding, remembering, or applying information; interacting with others;

concentrating, persisting, or maintaining pace; and adapting or managing himself.  (A.R. 81.)

Dr. Bhutwala further opined that Plaintiff was moderately limited in his ability to carry out a

range of work-related activities, including performing activities within a schedule, maintaining

regular attendance, and being punctual within customary tolerances.[5]  (A.R. 83-84.)

On January 10, 2020, psychologist Dr. Sharon Kahn, Ph.D., responded to interrogatories

from the ALJ.  (A.R. 710-18.)  She reviewed Plaintiff's treatment records through August 2019.

(A.R. 715.)  Based on these records, Dr. Kahn opined that Plaintiff had "moderate" limitations in

his ability to understand and remember complex instructions; carry out complex instructions;

make judgment on complex work-related decisions; interact appropriately with the public, co-

workers, and supervisors; and respond appropriately to usual work situations and changes in a

routine work setting.  (A.R. 710-11.)  She also assessed that Plaintiff had moderate limitations in

his ability to understand, remember, or apply information and interact with others.  (A.R. 715.)

---

84), however the record shows that Plaintiff received treatment from Dr. Santos as late as February 2018, (A.R. 420).

[5]  Dr. Bhutwala also opined that Plaintiff was moderately limited in his ability to understand, remember, or carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others; complete a normal workday/week without interruptions from symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness or cleanliness; respond appropriately to changes in work setting; travel to unfamiliar places or use public transport; and set realistic goals or make plans independently of others.

### 2.  Hearing before the Administrative Law Judge ("ALJ")

After Defendant denied Plaintiff's applications for benefits, Plaintiff requested a hearing before an ALJ.  (A.R. 102-03.)  On September 24, 2019, Plaintiff appeared *pro se* for a hearing before ALJ Kimberly Schiro.  (A.R. 34.)  ALJ Schiro explained to Plaintiff that he could postpone the hearing in order to obtain legal counsel, and Plaintiff elected to do so.  (A.R. 40.)  The hearing was postponed to July 23, 2020.  (A.R. 42-43.)  At the hearing, Plaintiff testified with his attorney and a Spanish-language interpreter present.  (*Id*.)  It is apparent from the transcript that the interpreter was frequently unable to translate what Plaintiff was saying.  (A.R. 53-55.)  For example, the ALJ asked the Plaintiff whether he was working, and the Plaintiff then apparently launched into a long answer, prompting the ALJ to tell the interpreter: "You can tell him to slow down.  It was just a yes or no answer."  (A.R. 51.)  The interpreter responded by attempting to summarize Plaintiff's answer, but the summary is difficult to understand.[6]  (*Id*.)  Shortly after, the ALJ asked the Plaintiff whether he is in treatment for anxiety and depression.  The interpreter provided a short response, prompting the ALJ to ask whether that was everything Plaintiff had said, indicating that it seemed as though Plaintiff had given a longer response.  (A.R. 51-52.)  The interpreter responded that that was everything Plaintiff said.  (A.R. 52.)  In addition, the proceedings were frequently interrupted due to technology issues that caused participants to be dropped from the call.  (*See, e.g.*, A.R. 57, 68.)

At the hearing, Plaintiff testified that he is unable to work because of his "nerves," which caused symptoms including anxiety, depression, forgetfulness, a feeling that he is being

---

[6]  The interpreter stated:  "Yes.  Okay.  He's saying now.  Since he reached to hear [sic], he never worked, and he has loss of memory, and that's why he lost Dr. Rico [PHONETIC] because explaining her remember things or following instructions or remembering instructions."  (A.R. 51.)

followed, loss of appetite, occasional hallucinations, difficulty focusing and concentrating, and panic attacks. (A.R. 51-56.) Plaintiff testified that he takes medication for his mental illness, and that the medication makes him feel tired and unmotivated—so unmotivated that he spends most of his day sleeping and does not have the energy to go to the park or do activities outside. (A.R. 52-53, 55.) Plaintiff testified that as a result of his forgetfulness and difficulty concentrating, he often forgets what he is about to say, occasionally forgets to take his medication, and once forgot about a pan of beans on the stove. (A.R. 55, 59.)

A vocational expert ("VE") also testified at the hearing. (A.R. 42-43, 60-65.) The VE was presented with a hypothetical individual of Plaintiff's age, education, and work history who is limited to performing simple, routine tasks at all exertional levels; no more than occasional contact with co-workers and supervisors; no direct work-related contact with the public; the ability to work around others but not on teams or in collaboration with others, such as tandem work; and the ability to make simple decisions and adapt to occasional changes and essential work tasks. (A.R. 60-61.) The VE testified that such an individual could work as a night janitor, a packager, and a warehouse worker. (A.R. 61-62.) However, the VE testified that if such an individual missed work more than once a month, he could not maintain any job. (A.R. 63.) The VE also stated if an individual was off task more than 10 percent of the day or if he was late to work by 30 minutes more than once a month, he would be unable to maintain any work. (A.R. 63-64.)

### 3. The ALJ's Decision

On July 9, 2020, ALJ Schiro issued a decision finding Plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act, and accordingly was not entitled to SSD or

SSI for the period from September 1, 2016 until July 9, 2020.  (A.R. 27.)  The ALJ found the

Plaintiff met the insured status requirements of the Act through September 30, 2017, and that

Plaintiff had not engaged in substantial gainful activity since the onset date of the alleged

disability on September 1, 2016.  (A.R. 21.)  She also found that Plaintiff had limited education

but was able to communicate in English.  (A.R. 25.)

ALJ Schiro found that Plaintiff had the severe impairments of major depressive disorder,

anxiety disorder, and PTSD.  (*Id.*).  The ALJ determined these impairments do not meet or

medically equal the severity of one of the listed impairments in Appendix 1 of the regulations.

In making this determination, the ALJ found that Plaintiff had only "moderate" limitations in

broad areas of functioning rather than "marked" or "extreme" limitations, and therefore did

not meet the requirements of Paragraph B, and that Plaintiff had not demonstrated a two-year

period of treatment for the severe mental health diagnosis, and therefore did not meet the

requirements of Paragraph C.  (A.R. 22.)  ALJ Schiro also noted that Plaintiff was "asymptomatic

with the current therapy" and was in "stable" condition.  (*Id.*)

ALJ Schiro further found that Plaintiff retained the residual functional capacity ("RFC")[7]

to "perform simple, routine tasks with occasional contact with co-workers and supervisors but

no direct work-related contact with the public and no work on teams or in collaboration with

others such as tandem working; make simple decisions; and adapt to occasional changes in

essential work tasks."  (A.R. 23.)  The ALJ stated that she reached this determination after

careful consideration of the record.  (*Id.*)  In particular, ALJ Schiro considered the medical

---

[7]  The RFC is an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting
on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).

opinions of consultative psychiatrist Dr. Rodriguez, medical expert Dr. Kahn, and state medical consultant Dr. Bhutwala, all of which she found persuasive or partially persuasive, and the opinion of Plaintiff's treating psychiatrist, Dr. Gonzales, which she found unpersuasive.  (A.R. 24-25.)  ALJ Schiro found there was insufficient evidence to determine whether this RFC permitted Plaintiff to perform his past work but, relying on testimony from the VE, concluded that he could perform work as a night janitor, packager, or warehouse worker.  (A.R. 25-26.)

### 4.   Appeal of the ALJ's Decision and Initiation of the Instant Action

On September 3, 2020, Plaintiff requested the Appeals Council review the ALJ's decision. (A.R. 317-20.)  The Appeals Council denied the request on December 23, 2020. (A.R. 1-8.)  This was the final act of the Commissioner.  Plaintiff commenced this action on February 19, 2021, asserting that ALJ Schiro failed to properly evaluate the medical evidence and failed to properly evaluate Plaintiff's subjective statements.

## <u>LEGAL STANDARDS</u>

A court reviewing a final decision by the Commissioner must, as a threshold matter, determine whether the ALJ provided the plaintiff with a full and fair hearing under the Secretary's regulations and fully and completely developed the administrative record.  *Intonato v. Colvin*, 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (citation omitted).  The duty to develop the record requires the ALJ "to ensure that the record contains sufficient evidence to make a determination."  *Bussi v. Barnhart*, 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003). The ALJ must obtain additional information "when the evidence as a whole is not complete enough for the ALJ to make a determination."  *Id.* (citation omitted).  An ALJ's failure to

adequately develop the record is an independent ground for vacating the ALJ's decision and remanding the case. *Moran v. Astrue*, 569 F.3d 108, 114-15 (2d Cir.2009).

Once the Court is satisfied that the plaintiff was afforded a full hearing and the record is fully developed, the Court then assesses the Commissioner's conclusions. In doing so, the Court is limited to determining whether the Commissioner's conclusions (1) "were supported by substantial evidence in the record," and (2) "were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B). The ALJ's decision must set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." *Id*. § 405(b)(1). It must do so "with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Herrera v. Comm'r of Soc. Sec.*, 2021 WL 4909955, at *5 (S.D.N.Y. Oct. 21, 2021) (citing *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010)).

That said, the ALJ need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010). If the ALJ fails to consider evidence in the record, the Court must be "able to look to other portions of the ALJ's

decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Mongeur*, 722 F.2d at 1040 (citation omitted). If the Commissioner's findings are supported by substantial evidence, those findings are conclusive. 42 U.S.C. § 405(g); *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

As to the correct legal standard, the Commissioner is required to conduct a sequential five-step inquiry whereby the Commissioner determines: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) if not, whether the claimant has a "severe impairment" that limits their ability to do basic work activities; (3) if so, whether the impairment is listed in Appendix 1 of the regulations, and what the claimant's RFC is; (4) if the impairment does not qualify as a listed impairment, whether the claimant possesses the RFC to perform their past work; and (5) if the claimant is not capable of performing past work, whether they are capable of performing other work that exists in the national economy. *Vellone v. Saul*, 2021 WL 319354, at *5 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Vellone on behalf of Vellone v. Saul*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). The claimant bears the burden of proof at the first four steps of the analysis, and at the last step, the Commissioner has the burden of showing there is other work the claimant could perform. *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

When considering medical opinions, the Commissioner must consider: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The supportability and consistency factors are the "most important," and ALJs must explain how they considered those factors for medical opinions. *Id*. §§ 416.920a, 416.920c(b)(2). The supportability inquiry focuses on how

well a medical source supported and explained their opinion.  *Vellone,* 2021 WL 319354, at *6.

The question of consistency concerns whether the opinion is consistent with other evidence in

the medical record.  *Id.*  The Commissioner is tasked with analyzing medical opinions at the

source-level, meaning the Commissioner need not discuss each medical opinion in the record,

and may apply the five factors holistically to a single medical source.  *Id.* §§ 404.1520c(b)(1),

416.920c(b)(1).  Regarding claims filed on or after March 27, 2017, in evaluating the medical

evidence, the Commissioner need not assign particular evidentiary weight to treating

physicians as was previously required by the Act.  *Vellone*, 2021 WL 319354, at *6.  However,

the regulations continue to recognize the "foundational nature" of the observations of treating

sources.  *Steven M.W. v. Comm'r of Soc. Sec.*, 2022 WL 2669491, at *6 (S.D.N.Y. June 17, 2022),

*report and recommendation adopted sub nom*., *Washburn v. Comm'r of Soc. Sec.*, 2022 WL

2669296 (S.D.N.Y. July 11, 2022).

## DISCUSSION

### 1.  The ALJ Failed to Fully Develop the Record.

The Court is not satisfied that the record was fully developed in this case, nor that the

Plaintiff was accorded a full hearing under the Secretary's regulations.  Because Social Security

proceedings are inquisitorial rather than adversarial in nature, the ALJ is required to

"affirmatively develop" the record.  *Moran*, 569 F.3d at 112.  As part of this duty, the ALJ must

"investigate the facts and develop the arguments both for and against granting benefits." *Sims*

*v. Apfel*, 530 U.S. 103, 111 (2000).  The ALJ's duty to develop the record "is particularly

important" in cases of mental illness due to the difficulty in determining whether an individual

with mental illness will be able to adapt to the workplace, *Hidalgo v. Colvin*, 2014 WL 2884018,

at *4 (S.D.N.Y. June 25, 2014), and because the perceived stigma attached to mental illness may

cause an individual to minimize his symptoms, *Primo v. Berryhill*, 2019 WL 2453343, at *13

(S.D.N.Y. Feb. 19, 2019), *report and recommendation adopted sub nom., Primo v. Comm'r of*

*Soc. Sec.*, 2021 WL 1172248 (S.D.N.Y. Mar. 29, 2021).

As described below, there remain several areas in this case where the facts and

arguments were not affirmatively developed, warranting remand.

a. Medical Records from 2016-2018 Were Not Fully Translated.

Portions of treatment records from Plaintiff's treating physicians were not translated

from Spanish to English.  While Spanish-language medical records underwent certified

translation, it appears certain portions of the documents were inadvertently skipped over by

the translator and remained untranslated.  The untranslated portions of the record appear to

be relevant, particularly regarding Plaintiff's symptoms during 2016 and 2017.  For example,

untranslated portions of a medical report by Dr. Santos created on June 22, 2017 discuss

Plaintiff's crisis hospitalization in September 2016—an incident for which there are no primary

sources in the record—and state that Plaintiff has delusions of being persecuted; has frequent

nightmares and flashbacks; and cannot socialize.  (A.R. 426.)  Similarly, untranslated portions of

Dr. Santos' records from February 15, 2018, state that Plaintiff missed his last appointment and

that he has no medication.  (A.R. 420.)

ALJ Schiro relied on both of these medical records, or more specifically, the English

portions of these records, to reach the conclusion that Plaintiff evidenced only "mild-to-

moderate limitations" in his functioning during this time period.  (A.R. 25.)  Because significant

portions of these records were not translated into English, the ALJ could not competently

assess the record to determine the extent of Plaintiff's symptoms during this time period.  This

failure to obtain complete translation of the documents results in an incomplete record.  *See*

*Velez o/b/o S.V. v. Colvin*, 2017 WL 814693, at *12-13 (W.D.N.Y. Mar. 2, 2017) (concluding that

the ALJ failed to develop the record where portions of relevant evidence were not translated

into English); *see also Min Xin Cheng v. Bd. of Immigr. Appeals*, 165 F. App'x 22, 23 (2d Cir.

2006) (explaining that the immigration judge likely violated his duty to fully develop the record

when he allowed certain letters to remain untranslated).

     The failure to develop the record in this regard prejudiced Plaintiff because the

untranslated portions in question related to the severity of his mental health symptoms during

a key time period, including the fact that he was hospitalized due to a mental health episode,

that he was experiencing delusions, that he was unable to socialize, that he was unable to

reliably attend medical appointments, and that he was unable to stay properly medicated

during this period.  (*See, e.g.* A.R. 420-26.)  Certain of these symptoms are also discussed in

English in subsequent medical records, but this does not cure the issue: the severity and

prevalence of these symptoms over the course of the full period at issue is significant to the

ALJ's decision, and therefore it is necessary for the ALJ to fully evaluate Plaintiff's symptoms as

documented at each medical appointment he attended during the relevant period.  *See Jackson*

*v. Kijakazi*, 2022 WL 2909860, at *12 (S.D.N.Y. July 7, 2022), *report and recommendation*

*adopted*, 2022 WL 2905146 (S.D.N.Y. July 22, 2022) (finding ALJ's failure to develop the record

on question of the plaintiff's absenteeism prejudiced the plaintiff even though there was some

evidence in the record regarding the issue); *see also Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir.

2019) (explaining ALJs must consider a "longitudinal" view of a claimant's mental health throughout the relevant time period).

On remand, the ALJ should develop the record by obtaining translations of the Spanish portions of the medical records and should ascertain whether these notes impact her ultimate determinations.

b.  Plaintiff's Testimony at the Hearing Was Not Adequately Translated.

The transcript from Plaintiff's hearing before the ALJ indicates that significant communication issues hampered the development of the record.  (A.R. 51-55.)  Specifically, as discussed in more detail in the background section above, Plaintiff apparently did not understand that he needed to pause to allow for the interpreter to translate his testimony into English, and as a result, substantial portions of his testimony were not translated, and other portions were translated poorly.  (See, e.g. A.R. 51-52, 55-56.)  This impacted Plaintiff's testimony about such core issues as his symptoms and current treatment.  (A.R. 51-52.)  Such communication issues pepper the transcript and cast doubt on whether Plaintiff was properly heard.  (See, e.g., A.R. 55, 56.)

It is likely that Plaintiff was disadvantaged by these interpretation issues because it is unclear from the hearing transcript exactly what symptoms Plaintiff suffered during the relevant time period and how these symptoms impacted his ability to work.  See, Di Paolo v. Barnhart, 2002 WL 257676, at *8 (E.D.N.Y. Feb. 8, 2002) (ALJ failed to develop the record where lack of interpreter at hearing resulted in claimant being unable to communicate her position); cf. Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 31–32 (2d Cir. 2013) (rejecting plaintiff's claim of inadequate interpretation at a hearing where the record showed that her

answers were responsive to the questions, and she failed to explain how she was

disadvantaged by any interpretation issues).

On remand, the ALJ should permit the Plaintiff another opportunity to be heard,

preferably with a translator that can conduct simultaneous translation, if one is available.[8]

c. <u>The Record is Not Fully Developed Regarding Plaintiff's Ability to Maintain Regular</u>
<u>Attendance.</u>

The record is not well developed on Plaintiff's ability to maintain regular attendance at a

job. The medical records indicate that Plaintiff missed numerous medical appointments for

various reasons, including because of anxiety episodes. (*See, e.g.,* A.R. 535, 549, 628, 740.) The

non-treating experts disagreed with Plaintiff's treating physician regarding how frequently

Plaintiff might miss work. (*See* A.R. 81, 593, 740.) At the hearing, the VE testified that if

Plaintiff missed more than one day of work per month, he would not be employable at any job

in the national economy. (A.R. 63.) Plaintiff's ability to attend work regularly was thus clearly a

pertinent issue for consideration. However, the ALJ did not ask Plaintiff questions regarding his

ability to maintain a regular schedule or whether Plaintiff might need to miss work in order to

attend his regular therapy appointments.

The ALJ's failure to ask Plaintiff about his ability to show up to work on a regular basis

was prejudicial because the ALJ's determination that Plaintiff could perform jobs in the national

economy was predicated on Plaintiff's ability to maintain regular attendance. *See Jackson,*

2022 WL 2909860, at *12 (finding ALJ's failure ask plaintiff about her ability to maintain regular

attendance was prejudicial because the ALJ's decision was predicated in part on plaintiff's lack

---

[8] Plaintiff argues the ALJ failed to properly evaluate his testimony, however since I conclude the testimony was not
fully developed, I do not consider this argument.

of absenteeism).  This failure was especially significant in light of the fact that the record

contains relevant evidence supporting the notion that Plaintiff could not maintain a regular

schedule—evidence the ALJ did not address in her decision.  *See April L.K. v. Comm'r of Soc.*

*Sec.*, 2022 WL 832026, at *5 (S.D.N.Y. Mar. 21, 2022) (finding reversible error where the ALJ

failed to address relevant evidence bearing upon the question of whether the plaintiff could

maintain a regular schedule, such as records reflecting that the plaintiff missed medical

appointments).

On remand, the ALJ should further develop the record regarding how Plaintiff may or

may not manage his schedule and whether or not he could reliably attend work without

missing days due to his symptoms or treatment.

> d.  <u>The Record is Not Fully Developed Regarding Plaintiff's Symptoms over the Course
> of the Entire Period at Issue.</u>

Plaintiff's counsel stated at the hearing that Plaintiff's symptoms "go back and forth"

over the period of time at issue, or in other words, that Plaintiff's wellbeing fluctuated over the

course of the four-year period at issue.  (A.R. 48-49.)  Indeed, in the mental illness context,

"[c]ycles of improvement and debilitating symptoms . . . are a common occurrence."  *Estrella*,

925 F.3d at 97.  A person with "cyclical mental health issues," who is sometimes well enough to

work and sometimes is not, "could not hold down a full-time job."  *Id.* (citation omitted).

Accordingly, ALJs must consider a "longitudinal" view of a claimant's mental health, bearing in

mind the often "fluctuating state of mental health," rather than looking at a "one-time

snapshot."  *Id.* at 98.

However, the ALJ did not ask Plaintiff any questions at the hearing regarding the longitudinal scope of his symptoms, including no questions about Plaintiff's symptoms during 2016 or 2017; his crisis hospitalization in 2016; his adjustment to moving to New York in 2018; or the impact on his symptoms, if any, of becoming homeless or of the COVID-19 pandemic. Rather, every question the ALJ posed to Plaintiff concerned his then-existing symptoms, experiences, and abilities.  (A.R. 51-58.)  Plaintiff's attorney asked one question about a prior experience—an incident in which Plaintiff forgot a pan of beans on the stove—but otherwise only asked questions providing a snapshot of Plaintiff's wellbeing on the day of the hearing. (A.R. 58-59.)  The scant questioning regarding the full period at issue constitutes a failure to develop the record.  *See Sherman v. Berryhill*, 2018 WL 1399210, at *10 (S.D.N.Y. Mar. 20, 2018) (finding the ALJ failed to develop the record where she did not ask Plaintiff questions about the entire period at issue).

This failure to develop the record regarding Plaintiff's longitudinal symptoms prejudiced Plaintiff, because the ALJ's determination that Plaintiff was not disabled from September 2016 until July 2020 relied primarily on findings about Plaintiff's purported wellbeing and stability as evidenced in "recent" records.  (A.R. 25.)  The decision also relied on opinions from consultants who may not have had access to Plaintiff's full medical records from 2016 or 2017.  For example, ALJ Schiro found Dr. Bhutwala's opinion to be "mostly persuasive," but this opinion stated that there was insufficient evidence for him to make a determination about Plaintiff's symptoms prior to September 30, 2017.  (A.R. 74.)  Such an acknowledgment from the physician that he did not review sufficient evidence only heightens the ALJ's duty to develop the record regarding the full period at issue.

24

On remand, further testimony from Plaintiff or his physicians regarding the full period at issue, including specific questions regarding his mental health breakdown in 2016 that resulted in his hospitalization, may be necessary to fully develop the record.  Moreover, the ALJ should ensure to consider not only whether Plaintiff is disabled as of the day of the hearing, but also whether Plaintiff was disabled for any portion of the time period at issue.

### 2.   The ALJ Erred in Finding Dr. Gonzales' Opinion Not Persuasive.

ALJ Schiro considered a range of medical opinions in reaching her determination of Plaintiff's RFC.  Specifically, she considered the opinions of Plaintiff's treating physician, Dr. Gonzales, who saw Plaintiff almost every month from August 2018 until shortly before the hearing; consultative psychiatrist Dr. Rodriguez, who examined Plaintiff once on August 6, 2018; and medical experts Drs. Khan and Bhutwala, who never examined Plaintiff and who based their opinions on a review of unspecified medical records.  Plaintiff's treating physician, Dr. Gonzales, opined that Plaintiff had marked limitations in his ability to perform a range of activities, whereas the non-treating physicians opined that Plaintiff suffered mostly moderate to mild limitations in this regard.  The ALJ found the treating physician's opinion to be unpersuasive for two reasons: first, because it was inconsistent with the opinions of the non-treating physicians, and second, because it was purportedly inconsistent with the medical record, as "recent medical visits" showed "mostly normal examinations."  (A.R. 25.)  Both of these findings, without further explanation on the supportability and consistency of the medical opinions, constitute legal error.

First, in finding that Dr. Gonzales' opinion was inconsistent with the opinions of the non-treating physicians, ALJ Schiro failed to accord proper weight to the supportability of Dr.

Gonzales' opinion in light of the fact that he was Plaintiff's treating physician.  Whether a

physician had the opportunity to treat the claimant is an "important" factor in assessing the

supportability of his opinion.  *Steven M.W.*, 2022 WL 2669491, at *6 (holding that the ALJ erred

when he failed to consider a doctor's status as the treating physician in weighing that doctor's

opinion against other evidence, even though the treating physician rule did not apply).  This is

especially true in the context of mental illness, where objective medical evidence such as x-rays

and MRIs are typically lacking.  *Id.*  Dr. Gonzales' status as Plaintiff's treating physician goes

directly to the degree of supportability of his opinion: because Dr. Gonzales is the only treating

physician to render an opinion, his opinion is presumptively better supported than the other

opinions.  It is unclear from the ALJ's opinion why she found the non-treating physician's

opinions to be better supported, especially considering two of the three non-treating

physicians relied solely on unspecified and likely incomplete records, further calling into

question the supportability of those opinions.  *Cf. Citro v. Colvin*, 2018 WL 1582443, at *14

(S.D.N.Y. Mar. 28, 2018) (cautioning that a non-treating physician's opinion could not be viewed

as "substantial evidence" where the physician had not reviewed all of the relevant objective

medical evidence).  In finding that the non-treating physicians' opinions were more persuasive

than Dr. Gonzales', ALJ Schiro should have at least explained why she found that these opinions

were better supported than that of Dr. Gonzales, in light of Dr. Gonzales' status as a treating

physician.

Second, in finding that Dr. Gonzales' opinion was inconsistent with the medical record,

ALJ Schiro impermissibly cherry-picked from the record rather than reviewing the record as a

whole.  *See, e.g., Anderson v. Kijakazi*, 2022 WL 938115, at *8 (S.D.N.Y. Mar. 3, 2022), *report*

*and recommendation adopted sub nom.*, *Anderson v. Comm'r of Soc. Sec.*, 2022 WL 925070

(S.D.N.Y. Mar. 29, 2022) (ALJ erred in discounting a medical opinion because he found the

plaintiff "show[ed] mostly normal mental status examinations," where in fact the record

demonstrated that the plaintiff's wellbeing fluctuated over time).  Specifically, ALJ Schiro found

that Dr. Gonzales' opinion was inconsistent with the fact that "the treatment notes support

mild-to-moderate limitations in the claimant's ability to function in daily activities and [at]

recent medical visits the claimant reported no depression or sleep disturbance, has

psychomotor activity within normal range, and had mostly normal examinations."  (A.R. 7.)  In

finding that the record showed "no depression or sleep disturbance" and "mostly normal

examinations," the ALJ ignored evidence showing that, at times, Plaintiff exhibited symptoms

including hallucinations, paranoid delusions, panic attacks, insomnia, pervasive loss of interest,

and decreased memory.  (*See, e.g.,* A.R. 420, 435-37, 589-90, 596, 601, 614, 618, 624, 626.)

Indeed, the parties stipulated that when Dr. Gonzales first examined Plaintiff, he found

Plaintiff was experiencing "auditory hallucinations, paranoia, poor sleep, anxiety attacks 3-4

times a week, excessive worry, isolative behavior, and difficulty sleeping."  (Joint Stipulation at

6.)  It is true that Dr. Gonzales' notes from numerous subsequent appointments describe

Plaintiff as having fair to good hygiene, fair to good attention, fair insight, fair judgment, normal

psychomotor activity, and intact thought process, but these same notes also consistently found

him to have a depressed mood, constricted affect, anxiety, and insomnia.  (*Id.* at 7-8.)  Dr.

Gonzales' notes also indicate Plaintiff went through cycles of improving and worsening

symptoms.  For example, Plaintiff's symptoms were "improved" on April 11, 2019, but on both

August 22, 2019, and December 6, 2019, Plaintiff's depressive symptoms had "increased." (*Id.* at 8, 9.)

This medical history suggests that while Plaintiff's examinations were "normal" in some regards, in other regards he continued to demonstrate signs of severe mental illness that may have impacted his ability to find and/or maintain work.  Thus, ALJ Schiro did not appear to account for the complete record in finding Dr. Gonzales' opinion inconsistent with the record. *See Gainous v. Comm'r of Soc. Sec.*, 2021 WL 4847071, at *5 (S.D.N.Y. Oct. 18, 2021) (ALJ erred when she relied on the plaintiff's "unremarkable" mental status exams to discount the conclusions of his treating psychologist and psychiatrists without mentioning the plaintiff's hospitalization for suicidality).

## CONCLUSION

For the reasons stated above, I find that the remand is appropriate to allow for a full development of the record.  In addition, I find that the ALJ applied the incorrect legal standards in her July 9, 2020 decision.  Plaintiff's motion for judgment on the pleadings is GRANTED and Defendant's motion for judgment on the pleadings is DENIED.  This case is remanded for further proceedings consistent with this decision.

**SO ORDERED.**

Dated: August 9, 2022
      New York, New York

KATHARINE H. PARKER
United States Magistrate Judge

28